IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

v.

BRIAN HERNANDEZ ACOSTA,

Defendant.

CRIMINAL ACTION FILE

NO. 4:17-CR-006-HLM-WEJ-1

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on defendant Brian Hernandez Acosta's Motion to Suppress Evidence [50] and Motion to Suppress Statements [51]. On September 13, 2017, the Court conducted an evidentiary hearing [77] regarding these Motions, which has been transcribed [82] (hereafter "Tr."). The parties have also briefed the issues raised. (See Gov't Br. [90]; Def.'s Resp. [100]; Gov't Reply [134].) For the reasons explained below, the undersigned **RECOMMENDS** that both Motions be **DENIED**.

## I.    THE INDICTMENT

On April 11, 2017, a grand jury in the Northern District of Georgia returned an eight-count Indictment [1] against Brian Hernandez Acosta, Nilageo Alvarez Acosta, and Jaime Adam Riano, charging conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c), sex trafficking of a

minor, in violation of 18 U.S.C. § 1591, and transportation of a minor for prostitution, in violation of 18 U.S.C. § 2423(a). The Indictment charges Brian Hernandez Acosta ("Defendant") in all eight counts. The Indictment also contains a forfeiture provision.[1]

## II. STATEMENT OF FACTS

### A. Events of December 19

On December 19, 2016, Detective Aberhoff of the Miami Dade Police Department contacted the Dalton Police Department regarding A.M., a sixteen-year-old girl who had been missing for approximately three months. (Tr. 8, 47.)[2] She spoke to Detective Aaron Simpson of the Dalton Police Department, who is also assigned to the FBI's Conasauga Safe Streets Task Force. (Id. at 6, 7.) Detective Aberhoff conveyed to Detective Simpson that during the course of the search for A.M., she had detected activity on Facebook by A.M. (under an alias) and had served subpoenas on Facebook in an effort to determine A.M.'s location. (Id. at 8-9.) A review of A.M.'s Facebook activity log showed IP addresses

---

[1] The grand jury returned a First Superseding Indictment [102] on December 5, 2017, which named two more individuals (Anthony Joseph Lawhon and Brandi Rice Stumpe) and alleged seven more counts.

[2] The Government spells this detective's name as "Averhoff." The Court uses the spelling found in the Transcript.

associated with her Facebook page.  (Id. at 9.)  A review of those IP addresses pointed to a cell phone registered to T-Mobile, which detectives then subpoenaed. (Id.)  A review of T-Mobile's subpoena responses indicated that Defendant was the account holder for the device that A.M. had used to log into her Facebook account.  (Id. at 9, 77.)

Detective Aberhoff gave Detective Simpson the address linked to Defendant's T-Mobile account in Dalton, as well as two other Dalton area addresses, and asked him to check them out to see if he could locate A.M.  (Tr. 9-10.)[3]  Detective Simpson looked up Defendant in the Dalton Police Department's report system to corroborate the addresses, examined Defendant's Facebook page to identify him, obtained a copy of Defendant's driver's license, and obtained a picture of A.M. from Detective Aberhoff.  (Id. at 10.)

Detective Simpson, accompanied by Detective Tucker, traveled first to 2410 Scott Drive, arriving there about 2:00 p.m.  (Tr. 10.)  They encountered a woman in a basement-type apartment and showed her a picture of Defendant.  (Id. at 11.)  This woman recognized Defendant, but reported that he was not there and

_____

[3] Those addresses included 2410 Scott Drive and 496 Horseshoe Way, Apt. J-204.  (Tr. 9-10.)  The detectives determined that the third address associated with Defendant was a restaurant that was no longer in business.  (Id. at 10, 12.)

did not live there.  (Id.)  The detectives then traveled to 496 Horseshoe Way, which was an apartment complex called Dawnville Meadows.  (Id.)  The detectives made contact with the apartment complex manager, who confirmed that Defendant lived there in unit J-204 and described his vehicle.  (Id. at 11, 64.)  The detectives also showed A.M.'s photograph to a maintenance worker for the complex, who remembered that he had seen her crying behind a dumpster close to Defendant's apartment only a couple weeks earlier.  (Id.)  When detectives knocked on the door of unit J-204, no one answered.  (Id. at 12.)

While still at the complex, Detective Simpson received a telephone call from another Dalton Police Department detective, who advised that Defendant had called the Department wanting to know why the police were looking for him.  (Tr. 12.)  Detective Simpson asked that detective to obtain contact information from Defendant and he (Simpson) would call him back.  (Id.)  When Detective Simpson arrived back at the station, the found a note from that detective listing three callback telephone numbers for Defendant.  (Id. at 12-13, 49.)  One of those numbers was for Defendant's personal cell phone (706-218-0655).  (Id. at 13-14, 48-49, 73.)

At about 4:00 p.m. on December 19, Detective Simpson made a recorded call to Defendant's personal cell phone.  (Tr. 13.)  Defendant answered and

Detective Simpson explained that he was looking for a missing sixteen-year-old girl from Miami known as A.M., and that he had information indicating that Defendant knew where she was or where she had been, and that Defendant had been associated with her. (Id.) Detective Simpson asked Defendant directly where A.M. was and how he could find her to get her home before Christmas. (Id.) Defendant denied knowing A.M. (Id. at 14.) Defendant further claimed that he was in Tampa, Florida until January 18, 2017, but he would contact Detective Simpson if he had further information. (Id. at 14, 41.) Defendant never called Detective Simpson back. (Id. at 14.) Moreover, as discussed below, Defendant was actually in Dalton, not Tampa. (Id. at 41.)

## B.  Events of December 28

On or about December 28, 2016, Detective Aberhoff contacted the Dalton Police Department and advised that she had located A.M.'s photograph in an advertisement posted in the escort services section of a website called www.Backpage.com. (Tr. 15-16.) It appeared that A.M. was in an advertisement for prostitution services; thus, the Detectives became concerned that a missing person case was turning into a sex trafficking case for a minor who needed to be found and rescued. (Id. at 16-17.)

Also on December 28, 2016, law enforcement officers attempted to conduct an operation designed to recover A.M. and any other minors being trafficked for commercial sex. (Tr. 17, 47-48.) Attempts to contact the telephone number listed in the advertisement with A.M. (706-463-8899) were unsuccessful. (Id. at 17-18, 48, 71.)

### C. Events of December 29

#### 1. The Undercover Operation

On December 29, 2016, Detective Simpson, acting in an undercover capacity, sent text messages and placed calls to (706) 463-8899, the number on the advertisement featuring A.M., in an attempt to meet (and rescue) A.M. at a Dalton hotel room (located at 1507 N. Tibbs Road) under the guise of requesting escort services. (Tr. 18-19, 42.) Between 2:00 and 3:00 p.m., Detective Simpson received a response from someone who called herself "Bianca," later identified as minor victim L.H. (Id. at 19, 82.) Detective Simpson asked for "Rachel," A.M.'s Backpage identity, but L.H. advised that A.M. was not available but she was. (Id. at 19.) Detective Simpson asked L.H. if she could do an "outcall." (Id.)[4] L.H.

_____

[4] In an "outcall," the prostitute travels to the John's (i.e., a male customer) location. (Tr. 19, 72.)

replied that she could, that she could meet Detective Simpson within thirty minutes, and that her rate was $150 for one-half hour. (Id. at 19, 42, 63-64, 82.) Detective Simpson then provided L.H. both the address and hotel room number. (Id. at 20, 82.)

Sometime before 3:00 p.m., a surveillance unit providing support near the designated hotel observed a car enter a nearby parking lot and drive recklessly. (Tr. 20, 47, 82.) When law enforcements officers stopped the vehicle for reckless driving, they encountered L.H. in the passenger seat and defendant Nilageo Alvarez Acosta in the driver's seat. (Id. at 20.) Because defendant Alvarez Acosta had the same last name as Defendant, and because defendant Alvarez Acosta had a girl in his vehicle, Detective Simpson believed that officers had stopped the vehicle transporting the girl for an outcall. (Id.) For verification, Detective Simpson called the same number that he had used to make contact with "Bianca," and a phone in the possession of defendant Alvarez Acosta and L.H. rang. (Id. at 21.)

GBI Agent Rene Green and Detective Tucker interviewed L.H. on the scene beginning at approximately 3:00 p.m., and relayed what they learned to Detective Simpson. (Tr. 21, 74-75.) During the interview, L.H. advised that Defendant was prostituting her; that Defendant knew she was a 17-year-old high

school student; that defendant Alvarez Acosta had driven her to the hotel for the purpose of commercial sex; and that A.M. looked familiar to her. (Id. at 21-22.) L.H. also explained that defendant Alvarez Acosta and Defendant are brothers, and conveyed that Defendant had been calling defendant Alvarez Acosta's cell phone repeatedly during the traffic stop. (Id. at 22.) L.H. added that Defendant ran a prostitution operation out of his apartment located at 496 Horseshoe Way, J-204. (Id.) Finally, L.H. relayed that Defendant used his personal cell phone to take pictures of her and other girls and then used that cell phone to post those pictures on Backpage. (Id. at 22, 72-74.)

## 2. Events at the Apartment Complex

Based on the initial information obtained in the interview of L.H., Detective Simpson, FBI Special Agent Susan Scott, and other law enforcement officers traveled to the Dawnville Meadows Apartments on December 29 to set up surveillance. (Tr. 22-23, 47-48.) While waiting there from approximately 3:00 to 4:00 p.m., Detective Simpson received periodic updates from Detective Tucker about his continuing interview with L.H. (Id. at 23, 75.)

At about 4:00 p.m., as Detective Simpson and Agent Scott sat in his vehicle, Defendant, accompanied by a male passenger, parked in the adjacent space, exited his vehicle, and started running toward his apartment. (Tr. 23-26, 52, 79.)

As Detective Simpson exited his vehicle, Defendant suddenly turned around and ran back toward his car. (Id. at 24, 52.) Detective Simpson, unsure whether Defendant had noticed the surveillance units and might be trying to leave, showed Defendant his badge, identified himself as law enforcement, informed Defendant that they needed to talk, and directed him to the back of his car. (Id. at 24, 41, 53-54.) At about the time Defendant reached the back of his car, he removed a cell phone from his pocket. (Id. at 55.)[5]

After Defendant saw Detective Simpson's credentials, Defendant asked a series of questions, including, "What's this about? Why are you stopping me? and "Why are we doing this in front of my house?" (Tr. 25.) Detective Simpson wanted to talk to Defendant, but before proceeding, Detective Simpson, accompanied by FBI Agent Manson, patted down Defendant for weapons. (Id. at

---

[5] The cell phone in defendant's possession was a gold Samsung Galaxy. (Tr. 44.) Detective Simpson testified to his belief that L.H. had, during the aforementioned interview with Detective Tucker, described the appearance of Defendant's cell phone. (Id. at 55-56, 58-59.) Given L.H.'s report that Defendant had used his personal cell phone to take photographs of her and other girls and post them on Backpage, and given Defendant's vehement and repeated protests that Detective Simpson could not take his personal cell phone (discussed infra), it was reasonable for Detective Simpson to believe that the cell phone in Defendant's hand was the one mentioned by L.H. even if he did not know its color, make, and model when he encountered Defendant at the apartment complex.

9

25-26, 53.)[6] Detective Simpson then told Defendant that he needed to ask him some questions, but would first need to retrieve his notebook and a recorder from his nearby vehicle, which he did. (Id. at 25, 27, 55.)[7] At this time, Defendant was not under arrest, was not handcuffed, was not restrained in any way, and no one ever pointed a gun at him. (Id. at 26-27.) Although Detective Simpson and other officers had firearms, the weapons were concealed. (Id. at 27-28, 43, 68-69.)

Detective Simpson began the conversation by reminding Defendant that they had spoken over the telephone earlier that day and that officers were looking for A.M., a missing sixteen-year old female from Miami. (Tr. 28.) According to Detective Simpson, Defendant responded in an argumentative and aggressive

---

[6] Detective Simpson engaged in the pat down for officer safety. In his experience, persons involved in pimping and sex trafficking commonly carry weapons. (Tr. 26.) No weapons were found. (Id. at 54.) As Detective Simpson and Agent Manson focused on Defendant, Agent Scott focused on questioning Defendant's male passenger; all officers were in plainclothes. (Id. at 26, 69.) Sergeant Zahn was also present and was heard only briefly on the recording. (Id. at 67-68.) Detective Murray was also at the apartment complex but not close to where the encounter occurred. (Id. at 68.)

[7] Detective Simpson's practice is to record all interviews, custodial or not. (Tr. 28.) The recording the Detective made of his approximately twelve-minute encounter with Defendant is in evidence as Government Exhibit 1. (Id. at 39-40, 54-55.)

fashion, which led the Detective to get firm with him and remind him that this was a serious matter. (Id.) Defendant reportedly said things like he did not know what the Detective was talking about, that officers had stopped him for no reason, and that officers did not have probable cause. (Id. at 29, 77.) Detective Simpson began to get frustrated with Defendant because he believed Defendant was lying about having no association with A.M., and because recent events showed that Defendant was also associated with L.H., a second minor victim. (Id. at 28.)[8] In response to Defendant's demands, Detective Simpson explained the probable cause that officers had developed so he would realize that they had more than "just a hunch" that he was associated with A.M. and L.H. (Id. at 29.)

When Detective Simpson realized that their conversation was not going anywhere given Defendant's lack of cooperation, he explained to Defendant that he was not under arrest, but that he was not free to leave; that officers believed he was operating a prostitution ring involving minor girls out of his apartment; that

---

[8] Detective Simpson testified that the evidence contradicted Defendant's claim that he did not know A.M. For example, the T-Mobile records showed that A.M. had been using a cell phone connected to Defendant; L.H., who was found in a car with Defendant's brother and with a cell phone Defendant had been calling repeatedly, informed Detective Tucker that she knew A.M.; and the maintenance man at the apartment complex where Defendant lived recognized A.M. and had recently seen her crying beside a dumpster. (Tr. 78.)

officers would be securing his apartment and his cell phone; and that agents would be writing search warrant applications for his apartment and his cell phone. (Tr. 29, 32-33, 44, 67; <u>see also</u> Gov't Ex. 1.)

Upon hearing this information, Defendant became more aggressive and belligerent, asserting "You can't take my phone. I want to talk to a lawyer." (Tr. 29, 73-74.)[9] Detective Simpson gave Defendant permission to call a lawyer. (<u>Id.</u> at 30.) However, after going through his cell phone's contacts, Defendant could not remember the lawyer's name or find his number. (<u>Id.</u>; <u>see also</u> <u>id.</u> at 31-32, 60.) Defendant even called a friend to get the name of a lawyer, but the friend did not answer. (<u>Id.</u> at 31, 60-61.)

Defendant then argued more with Detective Simpson over whether officers could seize his personal cell phone. (Tr. 30; <u>see also</u> Gov't Ex. 1.) Detective

_____

[9] In response to the Government's description of Defendant as aggressive and belligerent, he responds that the officers lost their tempers and raised their voices at him. (Def.'s Resp. 4, citing Gov't Ex. 1.) The recording shows that Defendant was verbally combative and that the officers became exasperated with him. However, the Court heard nothing on that recording which causes concern. In fact, the officers' voices were remarkably calm given the urgency they obviously felt to find the missing girl(s). Moreover, while Defendant contends that this encounter was an interrogation, he asked a number of questions which Detective Simpson tried to answer. (Tr. 43.) In the end, the recording sounds more like an argument.

Simpson explained that he had probable cause to believe that Defendant's cell phone contained evidence of child sex trafficking, and that while the cell phone would not be searched at that moment because it would take time to prepare a warrant application, officers could take the cell phone to prevent Defendant from deleting any evidence stored in it. (Tr. 30.)[10]

At this point, Detective Simpson took hold of Defendant's wrist so that he could not throw or destroy his cell phone and took it out of Defendant's hand. (Tr. 33, 44, 69.) Defendant protested, but Detective Simpson secured the phone,[11] returned with it to his office, and began preparing a warrant application to search it. (Id. at 33-34.)[12] Approximately twelve minutes transpired between Detective

--------------------

[10] Detective Simpson explained that the contents of a cell phone could easily be deleted by someone holding it or deleted by remote means. The cell phone could also be broken, which could destroy the evidence on it. (Tr. 30.) He wanted the cell phone's contents preserved for use in finding A.M. and any other minor victims. (Id.)

[11] To secure the cell phone, Detective Simpson placed it in airplane mode (which he did without entering the phone itself) and placed it in an evidence bag. Airplane mode would prevent anyone from remotely locking or wiping the data off the device. (Tr. 61-62).

[12] Defendant's cell phone was initially searched pursuant to a Whitfield County search warrant (dated January 3, 2017). A federal search warrant was subsequently obtained on June 27, 2017 after issues arose with executing the Whitfield County warrant. (Tr. 35-37; Gov't Exs. 2, 3.)

Simpson's first encounter with Defendant at the apartment complex and his seizure of Defendant's phone. (<u>Id.</u> at 39.) At no point during this twelve-minute encounter did anyone place Defendant in handcuffs, restrain him, or make physical contact with him (other than when Detective Simpson took hold of his wrist to seize the phone). (<u>Id.</u> at 43-44.) Other than his cell phone, no other item was seized from Defendant's person that day. (<u>Id.</u> at 38, 45, 50.)

### 3.   **Defendant's Arrest**

The investigation on December 29, 2017, was fast-moving. While Detective Simpson worked on a search warrant application for Defendant's cell phone, Detective Tucker finished interviewing L.H. and began working on a search warrant application for Defendant's apartment at 496 Horseshoe Way, J-204, Dalton, Georgia. (Tr. 34, 71.) Defendant's brother, Alvarez Acosta, who had been arrested after the traffic stop, was also interviewed by Detective Simpson. (<u>Id.</u> at 34, 70-71.) Moreover, officers also worked to prepare a search warrant application for L.H.'s cell phone, defendant Alvarez Acosta's cell phone, and for an email account associated with the Backpage ads. (<u>Id.</u> at 35, 71.)

Between 4:00 p.m. and 6:15 p.m., while Defendant was waiting outside his apartment along with the other agents, he was offered a jacket and water, both of which he declined.  (Tr. 38, 46, 70.)[13]  Defendant remained detained on the scene while the investigation continued and never complained that he was physically harmed in any way.  (Id. at 44-45, 46.)  Other than the aforementioned twelve minute interaction, Detective Simpson testified that no interrogation of Defendant took place, pre-custody or post-custody, and he was not threatened or beaten while he waited.  (Id. at 38-39, 45-46.)  Although he was not free to leave, Defendant was not restrained or placed in handcuffs until he was arrested at about 6:15 p.m.  (Id. at 38-39, 45-46, 66-67, 79.)  Following all of the aforementioned investigative activity and a conference among officers concerning the evidence collected, Detective Tucker made the decision to arrest Defendant for prostitution of a minor.  (Id. at 59, 70.)  The arrest occurred before the search of Defendant's apartment.  (Id.)

_____

[13] Defendant complains that it was cold as he waited outside for agents to return with the search warrant for his apartment.  (Def.'s Resp. 5-6.)  Defendant is heard on the recording complaining about the cold on at least two occasions.  (See Gov't Ex. 1.)  However, defendant was offered a jacket which he refused.  If Defendant was cold, he has no one to blame but himself.

### III. ANALYSIS

#### A. Defendant's Motion to Suppress Evidence

Defendant challenges the warrantless seizure of his cell phone. He asserts that Detective Simpson did not have probable cause to seize it, because he lacked sufficient facts to conclude that his cell phone was the one L.H. had alleged was used to take photos of the minor girls for the Backpage ads. (Def.'s Resp. 10.) The Government asserts that Detective Simpson had probable cause to seize Defendant's cell phone, not only because of information supplied by L.H., but also from the investigation to that point, including T-Mobile records linking Defendant to A.M., photographs of A.M. appearing on Backpage, and Defendant's denial that he knew A.M. when the evidence suggested otherwise. (Gov't Reply 10-11.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property." United States v. Jacobsen, 466 U.S. 109, 113 (1984). Warrantless seizures are "*per se* unreasonable under the Fourth Amendment—subject only to

a few specifically established and well-delineated exceptions." United States v. Ross, 456 U.S. 798, 825 (1982) (internal citation and quotation marks omitted).

One of those exceptions is "exigent circumstances," which allows police to bypass the warrant requirement when "the exigencies of the situation make the needs of law enforcement so compelling" that a warrantless seizure becomes reasonable. Kentucky v. King, 563 U.S. 452, 460 (2011) (internal quotation marks and citation omitted).

> Courts have catalogued several situations in which exigent circumstances exist, but it is clear that the exception must be applied carefully to each factual scenario. Exigent circumstances that have been recognized include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and "hot pursuit" of a fleeing suspect.

United States v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983); see also Arkansas v. Sanders, 442 U.S. 753, 759 (1979) (Exigent circumstances exception applies in "those cases where the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate.").

"The test of whether exigent circumstances exist is an objective one. '[T]he appropriate inquiry is whether the facts . . . would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant

could be secured.'" United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (quoting United States v. Rivera, 825 F.2d 152, 156 (7th Cir. 1987)). Because the protections of the Fourth Amendment are crucial to a free and viable society, the government shoulders a heavy burden of justifying the failure to obtain a warrant prior to the intrusion. United States v. Jeffers, 342 U.S. 48, 51 (1951).

In this case the record is clear that Detective Simpson had probable cause to believe that Defendant was engaged in sex trafficking of underage girls and that his cell phone contained evidence relevant to that suspected crime.[14] A.M. was using a cell phone connected to Defendant; L.H. reported that Defendant had used his cell phone to take pictures of girls and post them on Backpage; Defendant had made several calls to a cell phone found in the car driven by Defendant's brother (and in which L.H. was a passenger); A.M. had been identified by someone at the apartment complex where Defendant lived and seen

_____

[14] Probable cause exists when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996). Probable cause deals in probabilities that "are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 175 (1949).

crying by a dumpster; and when confronted by officers, Defendant did not want to surrender his personal phone.[15]

The risk of loss or destruction of evidence if Defendant were allowed to retain his cell phone while officers applied for a warrant to search it created exigencies which outweighed prior recourse to a neutral magistrate.  See United States v. Atkins, 702 F. App'x 890, 896 (11th Cir. 2017) (per curiam) ("'A temporary warrantless seizure supported by probable cause is reasonable so long as the police diligently obtained a warrant in a reasonable amount of time.'") (quoting United States v. Laist, 702 F.3d 608, 613 (11th Cir. 2012)); United States v. Harris, 688 F. App'x 223 (4th Cir. 2017) (per curiam) (noting "that the warrantless seizure of the cell phone was reasonable in light of the exigent circumstances").  Therefore, the Government having met its burden to establish

---

[15] Plaintiff seems to challenge L.H.'s veracity as an unconfirmed informant under Illinois v. Gates, 462 U.S. 213 (1983).  (Def.'s Br. 10.)  However, information provided by L.H. was corroborated.  (See Tr. 42.)  Moreover, officers had more than just the interview with L.H. on which to base probable cause.  Additionally, the Court rejects Defendant's argument that Detective Simpson had not been provided a description of the Gold Samsung Galaxy cell phone before its seizure.  (Def.'s Br. 10.)  As explained supra note 5, the Detective recalled that he had been provided a description of the Defendant's cell phone before its seizure; however, even if he was in error as to when he received that description, the facts show that Defendant's personal cell phone was being used for illegal activity and it was clear that the one seized from Defendant was that phone.

both probable cause and exigent circumstances, Defendant's Motion to Suppress Evidence (which pertains to his cell phone) should be **DENIED**.

### B. Defendant's Motion to Suppress Statements

Defendant argues that while Detective Simpson may have sought to conduct a <u>Terry</u> stop,[16] he soon became "in custody," which entitled him to <u>Miranda</u> warnings before he was questioned (which were not provided). (Def.'s Resp. 8-9.) Defendant also contends that he invoked his right to counsel during the encounter. Defendant further asserts that, because his detention lasted from about 4:00 p.m. to about 6:15 p.m., its length was unreasonable. For these reasons, Defendant contends that any statements he made should be suppressed. (<u>Id.</u> at 9.)

The Government responds that Defendant's Sixth Amendment right to counsel did not attach during the non-custodial encounter; that agents nevertheless allowed Defendant to contact an attorney, but he was not successful; that <u>Miranda</u> warnings were not required because Defendant was not in custody;

_____

[16] <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) (law enforcement officer may conduct a brief detention of an individual if the officer has a reasonable and articulable suspicion based upon objective facts that the defendant is committing, or is about to commit, a criminal act).

and that the twelve-minute encounter is at issue here, not the one lasting two and one quarter hours.  (Gov't Reply Br. 7-10.)

With regard to Defendant's arguments under <u>Miranda</u>, the right to warnings based on that decision "attaches when custodial interrogation begins." <u>United States v. Acosta</u>, 363 F.3d 1141, 1148 (11th Cir. 2004).  Courts typically apply a two-part test to determine whether a suspect is in custody for <u>Miranda</u> purposes:  "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave."  <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  "[A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes."  <u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010).  In other words, only "suspects 'subjected to restraints comparable to those associated with a formal arrest,' must be advised of their <u>Miranda</u> rights." <u>Acosta</u>, 363 F.3d at 1149 (quoting <u>Berkemer v. McCarthy</u>, 468 U.S. 420, 441 (1984).  In assessing whether a reasonable innocent person in Defendant's position was subjected to restraints comparable to those associated with a formal

arrest, the Eleventh Circuit directs this Court to consider the totality of the circumstances, including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the location and length of the detention. Luna-Encinas, 603 F.3d at 881.

In considering the totality of the circumstances here, the undersigned cannot say that Defendant was in "custody." Defendant was lawfully seized or detained as part of a sex trafficking investigation by officers in a public parking lot. Although officers patted Defendant down for weapons, he was never handcuffed and never restrained in any way. The detective and agents were in plain clothes and never drew or even showed their weapons. When Defendant asked if he were under arrest, he was told no. Moreover, the mere presence of multiple officers did not transform his circumstances into custody because only two (Simpson and Manson) primarily dealt with him, and a third (Zahn) was in and out of the conversation. Further, the officers never threatened Defendant or yelled at him and repeatedly sought to explain what was going on. The agents

even allowed Defendant to look for his attorney's telephone number on his phone and to call a friend to obtain the lawyer's name.[17]

In other, more restrictive circumstances, the Eleventh Circuit has found no custodial detention. See United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989) (although the officers detained a suspect by the display of firearms and handcuffing, the court declined to find that it constituted an arrest). The circumstances present here do not establish that Defendant's freedom of action was curtailed to a degree associated with formal arrest. See Acosta, 363 F.3d at 1147 ("[O]ur prior opinions confirm, that an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a

_____

[17] As noted above, Defendant argued that police violated his right to counsel. However, the Sixth Amendment right to counsel does not attach until prosecution is commenced. See McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). Prosecution had not commenced in December 2016. Defendant's argument is likely based on the Supreme Court's Fifth Amendment jurisprudence, which guarantees the right to counsel during custodial interrogation. See, e.g., Miranda, 384 U.S. at 436. In other words, Defendant probably meant to argue that questioning should have ceased when he said he wanted to call his lawyer. See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (once a suspect in custodial interrogation asserts his right to counsel, not only must the interrogation cease, but also he may not be approached for further interrogation until counsel has been made available to him). However, as already ruled, there was no custodial interrogation; thus, the prophylactic rights imposed by Miranda never attached.

suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car.") (citations omitted).

Simply because Defendant was not free to leave does not mean that he was in custody for <u>Miranda</u> purposes.  <u>See</u> <u>Maryland v. Shatzer</u>, 559 U.S. 98, 112 (2010) ("Our cases make clear, however, that the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody. We have declined to accord it 'talismanic power,' because <u>Miranda</u> is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'") (quoting <u>Berkemer</u>, 468 U.S. at 437.)  The Supreme Court further noted that "the temporary and relatively nonthreatening detention involved in a traffic stop or <u>Terry</u> stop . . . does not constitute <u>Miranda</u> custody." <u>Id.</u> at 113 (citations omitted).  Here, Defendant's twelve-minute detention before his cell phone was seized pursuant to probable cause was justified and non-threatening and did not necessitate <u>Miranda</u> warnings.  Further, no one questioned Defendant after the seizure of his cell phone.

Finally, with regard to the length of the detention, a focus only on the twelve minutes which elapsed between Detective Simpson's initial encounter with Defendant and the seizure of his cell phone takes too narrow a view of what occurred here.  Defendant was forced to wait two and one-quarter hours between

his initial encounter with the Detective at roughly 4:00 p.m. and his arrest at roughly 6:15 p.m.

"Under Terry v. Ohio, . . . , a police officer may briefly detain an individual if he has a reasonable and articulable suspicion that a person has committed or is about to commit a crime." United States v. Williams, 185 F. App'x 866, 868 (11th Cir. 2006) (per curiam) (citation omitted). "To determine whether the manner and length of an investigatory detention during a Terry stop was reasonable, [courts] 'apply four non-exclusive factors.'" Id. at 869 (quoting Acosta, 363 F.3d at 1146). "The factors are: (1) the purpose of the detention; (2) the diligence of the police in conducting the investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention." Id. at 869.

The purpose of the detention was to ask Defendant about A.M. and to make sure that he did not flee while Detectives sought search warrants for his home and his cell phone (which was seized twelve minutes after the encounter began). As for the second element, the record shows that Detectives Sullivan and Tucker were very diligent in conducting their investigation while Defendant waited outside his apartment. They were preparing search warrant applications, interviewing witnesses, and meeting to discuss what each had learned. There was no unreasonable delay. As for the third factor, Defendant was detained in front of

his apartment in a public area. While he could not leave, he was not in the back of a patrol car or handcuffed.

Finally, the fourth factor (and the one urged by Defendant) is whether the duration of the detention was reasonable. "There is no rigid time limitation or bright line rule regarding the permissible duration of a <u>Terry</u> stop." <u>Acosta</u>, 363 F.3d at 1147. Instead, the "test is one of 'common sense and ordinary human experience.'" <u>Id.</u> (quoting <u>United States v. Sharpe</u>, 470 U.S. 675, 685 (1985)). While the two and one-quarter hour detention here is at the upper end of a permissible duration, it was not unreasonable when considering the totality of circumstances. <u>See</u> <u>United States v. Partin</u>, 634 F. App'x 740, 744 (11th Cir. 2015) (per curiam) ("[A]lthough two hours is longer than the average <u>Terry</u> stop, in this scenario the officers were diligent and the total amount was reasonable in relation to the purpose of the stop and the necessary scope of the investigation."). The officers had a considerable amount of work to do in their investigation and arrested Defendant as soon as they felt comfortable doing so.

Although the Court need not decide the issue because the manner and length of the <u>Terry</u> stop was reasonable under the specific facts presented here, the undersigned would find that there was probable cause to arrest Defendant upon Detective Simpson's initial encounter with him on December 29 (just like

26

there was probable cause to seize his cell phone), based on all the evidence that had been collected to that point. Thus, the issue of whether the <u>Terry</u> stop matured into a de facto arrest before there was probable cause to do so is immaterial.

In sum, there is no basis to exclude any statement Defendant made during his twelve-minute recorded encounter with Detective Simpson (<u>i.e.</u>, Gov't Ex. 1.) Therefore, Defendant's Motion to Suppress Statements should be **DENIED**.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence [50] be **DENIED**; and

**FURTHER RECOMMENDS** that Defendant's Motion to Suppress Statements [51] be **DENIED**.

**SO RECOMMENDED**, this 19th day of December, 2017.

WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE