IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF
AMERICA,

v.

BRIAN HERNANDEZ
ACOSTA,

    Defendant.

CRIMINAL FILE NO.
4:17-CR-006-01-HLM-WEJ

## ORDER

This case is before the Court on the Motion to Suppress Evidence filed by Defendant Brian Hernandez Acosta ("Defendant") [50], on Defendant's Motion to Suppress Statements [51], and on the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [138].

## I. Standard of Review

28 U.S.C. § 636(b)(1) requires that in reviewing a magistrate judge's report and recommendation, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Court therefore must conduct a <u>de novo</u> review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006); <u>Jeffrey S. by Ernest S. v. State Bd. of Educ.</u>, 896 F.2d 507, 513 (11th Cir. 1990); <u>United States v. Gaddy</u>, 894 F.2d 1307, 1315 (11th Cir. 1990); <u>LoConte v. Dugger</u>, 847 F.2d 745, 750 (11th Cir. 1988). If no party files a timely objection to a factual finding in the report and recommendation, the Court reviews that finding for clear error. <u>Macort</u>, 208 F. App'x at

784. Legal conclusions, of course, are subject to de novo review even if no party specifically objects. United States v. Keel, 164 F. App'x 958, 961 (11th Cir. 2006); United States v. Warren, 687 F.2d 347, 347 (11th Cir. 1982).

## II. Background

### A. Procedural Background

On April 11, 2017, a federal grand jury sitting in the Northern District of Georgia returned an indictment against Defendant and two co-defendants, Nilageo Alvarez Acosta ("Defendant Alvarez Acosta"), and Jaime Adam Riano ("Mr. Riano"). (Indictment (Docket Entry No. 1).) Count one of the indictment charged Defendant and his co-defendants with conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c). (Id. at 1-8.) Counts two, four, and five charged Defendant with sex trafficking of various minors, in violation of 18 U.S.C. § 1591. (Id. at 8-11.) Counts six and

eight charged Defendant and his co-defendants with sex trafficking of minors, in violation of 18 U.S.C. § 1591. (Id. at 11, 12-13.) Count three charged Defendant with transportation of a minor for prostitution, in violation of 18 U.S.C. § 2423(a). (Id. at 9.) Count seven charged Defendant and Defendant Alvarez Acosta with transportation of a minor for prosecution, in violation of 18 U.S.C. § 2423(a). (Id. at 12.) The indictment also contained a forfeiture provision. (Id. at 13-15.)

On May 13, 2017, Defendant filed his Motion to Suppress Evidence and his Motion to Suppress Statements. (Mot. Suppress Evidence (Docket Entry No. 50); Mot. Suppress Statements (Docket Entry No. 51).) On September 13, 2017, Judge Johnson conducted an evidentiary hearing with respect to those Motions. (Minute Entry (Docket Entry No. 77).)

4

On December 5, 2017, the grand jury issued a First Superseding Indictment against Defendant and his co-defendants, adding two defendants, Anthony Joseph Lawhon ("Defendant Lawhon") and Brandi Rice Stumpe ("Defendant Stumpe"), dropping Mr. Riano as a defendant, and bringing more charges.  (First Superseding Indictment (Docket Entry No. 102).)  Count one of the First Superseding Indictment charged Defendant and his co-defendants with conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. § 1594(c).  (Id. at 1-9.)  Counts two, four, and five charged Defendant with sex trafficking by force, fraud, and coercion and sex trafficking of a minor, in violation of 18 U.S.C. § 1591.  (Id. at 10-13.)  Counts six, eight, and nine charged Defendant and his co-defendants with sex trafficking by force, fraud, and coercion and sex trafficking of a minor, in violation of 18 U.S.C. § 1591.  (Id. at 13-16.) Count three

charged Defendant with transportation of a minor for prostitution, in violation of 18 U.S.C. § 2423(a). (Id. at 11.) Count seven charged Defendant and Defendant Alvarez Acosta with transportation of a minor for prosecution, in violation of 18 U.S.C. § 2423(a). (Id. at 14.) Count ten charged Defendant and Defendant Lawhon with production of child pornography, in violation of 18 U.S.C. § 2251(a). (Id. at 17.) Count eleven charged Defendant with possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). (Id. at 17-18.) Count twelve charged Defendant with engaging in a child exploitation enterprise, in violation of 18 U.S.C. § 2252A(g). (Id. at 18-19.) Count thirteen charged Defendant with obstructing enforcement of 18 U.S.C. § 1591, in violation of 18 U.S.C. § 1591(d). (Id. at 19-20.) Count fifteen charged Defendant, Defendant Lawhon, and Defendant Stumpe with distributing a controlled substance to

a person under twenty-one years of age, in violation of 21 U.S.C. § 859(a). (Id. at 21.) The first superseding indictment also contained a forfeiture provision. (Id. at 22-25.)

On December 19, 2017, Judge Johnson issued his Non-Final Report and Recommendation. (Non-Final Report & Recommendation (Docket Entry No. 138).) Judge Johnson recommended that the Court deny the Motion to Suppress Evidence and the Motion to Suppress Statements. (Id.)

As of the date of this Order, the Clerk's docket indicates that Defendant has not filed Objections to the Non-Final Report and Recommendation. (See generally Docket.) The time period for filing Objections has expired,[1] and the Court finds that the matter is ripe for resolution.

---

[1]    The three-day extension for mailing no longer applies to documents, such as the Non-Final Report and Recommendation, served via the Court's electronic filing system.

## B. Factual Background

On December 19, 2016, Detective Aberhoff of the Miami Dade Police Department contacted the Dalton Police Department concerning A.M., a sixteen-year-old girl who had been missing for approximately three months. (Tr. (Docket Entry No. 82) at 8, 47.)[2] Detective Aberhoff spoke with Detective Aaron Simpson of the Dalton Police Department. (Id. at 6-7.) Detective Simpson is also assigned to the Federal Bureau of Investigation's ("FBI") Conasauga Safe Streets Force. (Id.) Detective Aberhoff conveyed to Detective Simpson that, during the course of her search for A.M., she detected activity on Facebook by A.M., under an alias, and had served subpoenas on Facebook to attempt to determine A.M.'s location. (Id. at 8-9.) A review of A.M.'s

---

[2] The Court, like Judge Johnson, uses the spelling for Detective Aberhoff's last name found in the transcript. (Non-Final Report & Recommendation at 2 n.2.)

Facebook activity log showed IP addresses associated with her Facebook page. (Id. at 9.) A review of the IP addresses pointed to a cell phone registered to T-Mobile, which detectives then subpoenaed. (Id.) A review of T-Mobile's subpoena responses indicated that Defendant was the account holder for the device that A.M. had used to log into Facebook. (Id. at 9, 77.)

Detective Aberhoff gave Detective Simpson the address linked to Defendant's T-Mobile account in Dalton, as well as two other Dalton-area addresses, and asked him to check the addresses to see if he could locate A.M. (Tr. at 9-10.)[3] Detective Simpson looked up Defendant in the Dalton Police Department's report system to corroborate the addresses,

---

[3] The addresses included 2410 Scott Drive and 496 Horseshoe Way, Apt. J-204. (Tr. at 9-10.) The detectives determined that the third address associated with Defendant was a restaurant that was no longer in business. (Id. at 10, 12.)

examined Defendant's Facebook page to identify him, obtained a copy of Defendant's driver's license, and obtained a photograph of A.M. from Detective Aberhoff. (Id. at 10.)

Detective Simpson, accompanied by Detective Tucker, first traveled to 2410 Scott Drive, and arrived there at approximately 2:00 p.m. (Tr. at 10.) The detectives encountered a woman in a basement-type apartment, and they showed her a picture of Defendant. (Id. at 11.) The woman recognized Defendant, but reported that Defendant was not there and did not live there. (Id.)

The detectives then traveled to 496 Horsehoe Way, which was an apartment complex called Dawnville Meadows. (Tr. at 11.) The detectives made contact with the apartment complex manager, who confirmed that Defendant lived there in unit J-204 and described his vehicle. (Id. at 11, 64.) The detectives also showed A.M.'s photograph to a maintenance

worker for the complex, who remembered that he had seen her crying behind a dumpster near Defendant's apartment only a couple of weeks earlier. (Id.) No one answered when the detectives knocked on the door of unit J-204. (Id. at 12.)

While at the complex, Defendant Simpson received a telephone call from another Dalton Police Department detective, who stated that Defendant had called the police department wanting to know why the police were looking for him. (Tr. at 12.) Detective Simpson asked the other detective to obtain contact information for Defendant and said that Detective Simpson would call him back. (Id.) When Detective Simpson returned to the station, he found a note from the other detective listing three callback telephone numbers for Defendant. (Id. at 12-13, 49.) One of the numbers was for Defendant's personal cell phone, 706-218-0655. (Id. at 13-14, 48-49, 73.)

11

At approximately 4:00 p.m. on December 19, Detective Simpson made a recorded call to Defendant's personal cell phone. (Tr. at 13.) Defendant answered, and Detective Simpson explained that he was looking for a missing sixteen-year-old girl from Miami known as A.M., that he had information indicating that Defendant knew where A.M. was or where she had been, and that Defendant had been associated with A.M. (Id.) Detective Simpson asked Defendant directly where A.M. was and how he could find her to get her home before Christmas. (Id.) Defendant denied knowing A.M. (Id. at 14.) Defendant claimed that he was in Tampa, Florida, until January 18, 2017, but stated that he would contact Detective Simpson if he had further information. (Id. at 14, 41.) Defendant never called Detective Simpson back. (Id. at 14.) Defendant was actually in Dalton, not Tampa. (Id. at 41.)

12

On or about December 28, 2016, Detective Aberhoff contacted the Dalton Police Department and advised that she had located A.M.'s photograph in an advertisement posted in the escort services section of a website called www.Backpage.com. (Tr. at 15-16.) It appeared that A.M. was in an advertisement for prostitution services, and the detectives became concerned that a missing person case was turning into a sex trafficking case for a minor who needed to be found and rescued. (Id. at 16-17.)

On that same day, law enforcement officers attempted to conduct an operation designed to recover A.M. and any other minors being trafficked for commercial sex. (Tr. at 17, 47-48.) Attempts to contact the telephone number listed in the advertisement with A.M., 706-463-8899, were unsuccessful. (Id. at 17-18, 48, 71.)

On December 29, 2016, Detective Simpson, acting in an undercover capacity, sent text messages and placed calls to (706) 463-8899, the number on the advertisement featuring A.M., in an attempt to meet and rescue A.M. at a Dalton hotel room located at 1507 N. Tibbs Road, under the guise of requesting escort services. (Tr. at 18-19, 42.) Between 2:00 p.m. and 3:00 p.m., Detective Simpson received a response from someone who called herself "Bianca," later identified as minor victim L.H. (Id. at 19, 82.) Detective Simpson asked for "Rachel," A.M.'s Backpage identity, and L.H. advised that A.M. was not available but that she was. (Id. at 19.) Detective Simpson asked L.H. if she could do an "outcall," or travel to his location. (Id. at 19, 72.) L.H. responded that she could, that she could meet Detective Simpson within thirty minutes, and that her rate was $150 for one-half hour.

14

(Id. at 19, 42, 63-64, 82.)  Detective Simpson provided L.H. with the address and hotel room number.  (Id. at 20, 82.)

Sometime before 3:00 p.m., a surveillance unit providing support near the designated hotel observed a car enter a nearby parking lot and drive recklessly.  (Tr. at 20, 47, 82.) When law enforcement officers stopped the vehicle for reckless driving, they encountered L.H. in the passenger seat and Defendant Alvarez Acosta in the driver's seat.  (Id. at 20.)  Because Defendant Alvarez Acosta had the same last name as Defendant and had a girl in his vehicle, Detective Simpson believed that officers had stopped the vehicle transporting the girl for an outcall.  (Id.)  For verification, Detective Simpson called the same number that he had used to make contact with "Bianca," and a phone in the possession of Defendant Alvarez Acosta and L.H. rang. (Id. at 21.)

Georgia Bureau of Investigation ("GBI") Agent Rene Green and Detective Tucker interviewed L.H. on the scene beginning at approximately 3:00 p.m., and they relayed what they learned to Detective Simpson. (Tr. at 21, 74-75.) During the interview, L.H. stated that Defendant was prostituting her, that Defendant knew she was a seventeen-year-old high school student, that Defendant Alvarez Acosta had driven her to the hotel for the purpose of commercial sex, and that A.M. looked familiar to her. (Id. at 21-22.) L.H. also explained that Defendant Alvarez Acosta and Defendant are brothers, and stated that Defendant had been calling Defendant Alvarez Acosta's cell phone repeatedly during the traffic stop. (Id. at 22.) L.H. added that Defendant ran a prostitution operation out of his apartment at 496 Horseshoe Way, J-204. (Id.) L.H. also stated that Defendant used his personal cell phone to take pictures of her and other girls,

16

and then used that cell phone to post the pictures on Backpage. (Id. at 22, 72-74.)

Based on the initial information from L.H.'s interview, Detective Simpson, FBI Special Agent Susan Scott, and other law enforcement officers traveled to the Dawnville Meadows Apartments on December 29 to set up surveillance. (Tr. at 22-23, 47-48.) While waiting there from approximately 3:00 to 4:00 p.m., Detective Simpson received periodic updates from Detective Tucker about his continuing interview with L.H. (Id. at 23, 75.)

At approximately 4:00 p.m., as Detective Simpson and Agent Scott sat in Detective Simpson's vehicle, Defendant, accompanied by a male passenger, parked in the adjacent space, exited his vehicle, and began running toward his apartment. (Tr. at 23-26, 52, 79.) As Detective Simpson exited his vehicle, Defendant suddenly turned around and

ran back toward his car. (Id. at 24, 52.) Detective Simpson, who was unsure whether Defendant had noticed the surveillance units and might be trying to leave, showed Defendant his badge, identified himself as law enforcement, informed Defendant that they needed to talk, and directed Defendant to the back of his car. (Id. at 24, 41, 53-54.) At about the time that Defendant reached the back of his car, he removed a cell phone from his pocket. (Id. at 55.)

The cell phone in Defendant's possession was a gold Samsung Galazy. (Tr. at 44.) Detective Simpson testified to his belief that L.H. had described the appearance of Defendant's cell phone during her interview with Detective Tucker. (Id. at 55-56, 58-59.) The Court agrees with Judge Johnson that, "[g]iven L.H.'s report that Defendant had used his personal cell phone to take photographs of her and other girls and post them, on Backpage, and given Defendant's

vehement and repeated protests that Detective Simpson could not take his personal cell phone . . ., it was reasonable for Detective Simpson to believe that the cell phone in Defendant's hand was the one mentioned by L.H. even if he did not know the color, make, and model when he encountered Defendant at the apartment complex." (Id. at 9 n.5.)

After Defendant saw Detective Simpson's credentials, Defendant asked a series of questions, including, "What's this about?" "Why are you stopping me?" and "Why are we doing this in front of my house?" (Tr. at 25.) Detective Simpson wanted to talk to Defendant, but, before proceeding, Detective Simpson, accompanied by FBI Agent Manson, patted down Defendant for weapons. (Id. at 25-26, 53.) Defendant Simpson conducted the pat down for officer safety, as, in his experience, individuals involved in pimping

and sex trafficking commonly carry weapons. (Id. at 26.) The officers did not find weapons. (Id. at 54.)[4]

Detective Simpson told Defendant that he needed to ask him some questions, but that he would first need to retrieve his notebook and a recorder from his nearby vehicle. (Tr. at 25, 27, 55.) Detective Simpson retrieved those materials. (Id.)[5] Defendant was not under arrest, was not handcuffed, and was not restrained in any way, and no one ever pointed a gun at him. (Id. at 26-27.) Although Detective

---

[4] While Detective Simpson and Agent Manson focused on Defendant, Agent Scott focused on questioning Defendant's male passenger. (Tr. at 26.) All officers were in plainclothes. (Id. at 69.) Sergeant Zahn was also present and was heard only briefly on the recording. (Id. at 67-68.) Detective Murray was also at apartment complex but was not close to where the encounter occurred. (Id. at 68.)

[5] Detective Simpson's practice is to record all interviews. (Tr. at 28.) The Government presented the recording that Detective Simpson made of his encounter with Defendant as Government Exhibit 1. (Id. at 39-40, 54-55.)

Simpson and the other officers had firearms, the weapons were concealed. (Id. at 27-28, 43, 68-69.)

Detective Simpson reminded Defendant that they had spoken via telephone earlier that day and that officers were looking for A.M., a missing sixteen-year-old female from Miami. (Tr. at 28.) Detective Simpson testified that Defendant responded in an argumentative and aggressive fashion, which led Detective Simpson to get firm with Defendant and remind him that his was a serious matter. (Id.) According to Detective Simpson, Defendant said things such as he did not know what Detective Simpson was talking about, that officers had stopped him for no reason, and that officers did not have probable cause. (Id. at 29, 77.) Detective Simpson began to become frustrated with Defendant because he believed that Defendant was lying about having no association with A.M., and because recent

21

events showed that Defendant was also associated with L.H., a second minor victim. (<u>Id.</u> at 28.)[6] In response to Defendant's demands, Detective Simpson explained the probable cause that officers had developed so that Defendant would realize that the officers had more than "just a hunch" that Defendant was associated with A.M. and L.H. (<u>Id.</u> at 29.)

When Detective Simpson realized that the conversation was going nowhere in light of Defendant's lack of cooperation, he explained to Defendant that: (1) Defendant was not under arrest, but was not free to leave; (2) officers

_____

[6] Detective Simpson testified that evidence contradicted Defendant's claim that he did not know A.M. (Tr. at 78.) For instance, the T-Mobile records showed that: (1) A.M. had been using a cell phone connected to Defendant; (2) L.H., who was found in a car with Defendant's brother with a cell phone that Defendant had been calling repeatedly, informed Detective Tucker that she knew A.M.; and (3) the maintenance man at the apartment complex where Defendant lived recognized A.M. and had recently seen her crying beside a dumpster. (<u>Id.</u>)

believed Defendant was operating a prostitution ring involving minor girls out of his apartment; (3) officers would be securing Defendant's apartment and cell phone; and (4) agents would be preparing search warrant applications for Defendant's apartment and cell phone. (Tr. at 29, 32-33, 44, 67; Gov't Ex. 1.) Defendant, after hearing this information, became more aggressive and belligerent, asserting: "You can't take my phone. I want to talk to a lawyer." (Id. at 29, 73-74.) Detective Simpson gave Defendant permission to call a lawyer. (Id. at 30.) Defendant, however, could not remember the lawyer's name or find his number after going through his cell phone's contacts. (Id. at 30-32, 60.) Defendant called a friend to get the name of a lawyer, but the friend did not answer. (Id. at 31, 60-61.)[7]

_____

[7]     The Court agrees with Judge Johnson's assessment of the recording, and concurs that nothing on that recording causes

Defendant continued to argue with Detective Simpson concerning whether officers could seize his personal cell phone. (Tr. at 30; Gov't Ex. 1.) Detective Simpson stated that he had probable cause to believe that Defendant's cell phone contained evidence of child sex trafficking, and that, while the officers would not search the phone at that moment because it would take time to prepare a warrant application, officers could take the phone to prevent Defendant from deleting any evidence stored in it. (Tr. at 30.) Detective Simpson testified that the contents of a cell phone could easily be deleted by someone holding the phone or could be deleted by remote means. (Id.) According to Detective Simpson, the phone could also be broken, which could destroy the evidence on the phone. (Id.) Detective Simpson

---

concern. (Non-Final Report & Recommendation at 12 n.9.)

24

wanted the cell phone's contents preserved for use in finding A.M. and any other minor victims. (Id.)

Detective Simpson took hold of Defendant's wrist so that Defendant could not throw or destroy his cell phone, and took the phone out of Defendant's hand. (Tr. at 33, 44, 49.) Although Defendant protested, Detective Simpson secured the phone, returned with it to his office, and began preparing an application for a warrant to search it. (Id. at 33-34.) Detective Simpson secured the cell phone by placing it in airplane mode without entering the phone itself, and by placing the phone in an evidence bag. (Id. at 61-62.) Airplane mode would prevent anyone from remotely locking or wiping the data off the device. (Id.)[8]

---

[8] Defendant's cell phone was initially searched pursuant to a January 3, 2017, Whitfield County search warrant. (Tr. at 35-37.) Law enforcement obtained a federal search warrant on

25

Approximately twelve minutes elapsed between Detective Simpson's first encounter with Defendant at the apartment complex and his seizure of Defendant's phone. (Tr. at 39.) During that time period, no one placed Defendant in handcuffs, restrained him, or made physical contact with him, with the exception of Detective Simpson taking hold of his wrist to seize the phone. (Id. at 43-44.) Other than his cell phone, no other item was seized from Defendant's person on that day. (Id. at 38, 45, 50.)

While Detective Simpson worked on a search warrant application for Defendant's cell phone, Detective Tucker finished interviewing L.H. and began working on a search warrant application for Defendant's apartment at 496 Horseshoe Way, J-204. (Tr. at 34, 71.) Detective Simpson

---

June 27, 2017, after issues arose with executing the Whitfield County warrant. (Id.; Gov't Exs. 2-3.)

also interviewed Defendant Alvarez Acosta, who had been arrested after the traffic stop. (Id. at 34, 70-71.) Officers also worked to prepare a search warrant application for L.H.'s cell phone, for Defendant Alvarez Acosta's cell phone, and for an e-mail account associated with the Backpage ads. (Id. at 35, 71.)

Between 4:00 and 6:15 p.m., while Defendant waited outside his apartment with the other agents, officers offered Defendant a jacket and water, which Defendant declined. (Tr. at 38, 46, 70.)[9] Defendant remained detained on the scene while the investigation continued, and he never complained that he was physically harmed. (Id. at 44-46.) Detective Simpson testified that, other than the twelve-minute interaction previously described, no interrogation of

---

[9]    The Court agrees with Judge Johnson's assessment of Defendant's complaints about the cold. (Non-Final Report & Recommendation at 15 n.13.)

Defendant occurred, and Defendant was not threatened or beaten while he waited.  (Id. at 38-39, 45-46.)  Although Defendant was not free to leave, he was not restrained or placed in handcuffs until he was arrested at approximately 6:15 p.m.  (Id. at 38-39, 45-36, 66-67, 79.)  After the investigative activity described above and a conference among the officers about the evidence collected, Detective Tucker made the decision to arrest Defendant for prostitution of a minor.  (Id. at 59, 70.)  The arrest occurred before the search of Defendant's apartment.  (Id.)

## III.   Discussion

### A.   Motion to Suppress Evidence

Judge Johnson accurately summarized the law governing the Fourth Amendment and exigent circumstances.  (Non-Final Report & Recommendation at 16-18.)  The Court agrees with Judge Johnson that "the record

is clear that Detective Simpson had probable cause to believe that Defendant was engaged in sex trafficking of underage girls and that his cell phone contained evidence relevant to that suspected crime." (Id. at 18 (footnote omitted).)[10] Judge Johnson also properly found that "[t]he risk of loss or destruction of evidence if Defendant were allowed to retain his cell phone while officers applied for a warrant to search it created exigencies which outweighed prior recourse to a neutral magistrate." (Id. at 19 (citations omitted).) Under those circumstances, the Court agrees with Judge Johnson that the Government met its burden to show probable cause and exigent circumstances, and denies

---

[10] In reaching this conclusion, Judge Johnson properly rejected Defendant's challenge to L.H.'s veracity as an unconfirmed informant, and correctly rejected Defendant's argument that Detective Simpson had not received a description of the Gold Samsung Galaxy cell phone before its seizure. (Non-Final Report & Recommendation at 19 n.15.)

Defendant's Motion to Suppress Statements, which pertains to Defendant's cell phone. (Id. at 19-20.)

## B.   Motion to Suppress Statements

Judge Johnson correctly noted that the right to <u>Miranda</u> warnings "attaches when custodial interrogation begins." (Non-Final Report & Recommendation at 21 (internal quotation marks and citation omitted).)   Judge Johnson accurately set forth the law governing whether a suspect is in custody for <u>Miranda</u> purposes.   (Id. at 21-22.)   The Court further agrees with Judge Johnson that, considering the totality of the circumstances here, Defendant was not in custody during the twelve-minute exchange prior to the seizure of his cell phone, and <u>Miranda</u> warnings were not necessary.   (Id. at 22-24.)   No one questioned Defendant after the seizure of Defendant's cell phone. (Id. at 24.)   The Court further agrees with Judge Johnson that, even

presuming that Defendant's detention lasted for two and one-quarter hours, the length of the detention was not unreasonable under the totality of the circumstances. (Id. at 24-26.) Alternatively, the Court agrees with Judge Johnson that "there was probable cause to arrest Defendant upon Detective Simpson's initial encounter with him on December 29, . . . based on all the evidence that had been collected to that point." (Id. at 26-27.) The Court therefore adopts this portion of the Non-Final Report and Recommendation, and denies Defendant's Motion to Suppress Statements.

## IV. Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [138], **DENIES** Defendant's Motion to Suppress Evidence [50], and **DENIES** Defendant's Motion

to Suppress Statements [51].

IT IS SO ORDERED, this the 5 day of January, 2018.

_____
SENIOR UNITED STATES DISTRICT JUDGE